**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| W.L. B/N/F D.L. & A.L., | § | |
| | § | |
| Plaintiff, | § | **CIVIL ACTION NO. 4:25-CV-3-AGD** |
| v. | § | |
| | § | |
| WYLIE INDEPENDENT SCHOOL DISTRICT, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is Defendant Wylie Independent School District's ("Defendant") Motion for Summary Judgment (Dkt. #16) ("Defendant's Motion") and Plaintiff[1] W.L.'s ("Plaintiff") Motion for Judgment on the Administrative Record (Dkt. #17) ("Plaintiff's Motion"). Having reviewed the motions and all other relevant filings, the court finds that each motion should be granted in part and denied in part.

## I. BACKGROUND

### *A. Factual Background*

Plaintiff was enrolled in Defendant's school district through "his 8th grade year, the 2023-2024 school year" (Dkt. #17 at p. 1). Since Plaintiff's ninth grade year, the 2024-2025 school year, he has been homeschooled (AR 4). Initially, Plaintiff was identified as eligible for "special education with autism, speech impairment, and other health impairment," ("OHI"), for attention

[1] It has long been held that "[t]he next friend, by whom the suit is brought on behalf of the infant, is neither technically nor substantially the party, but resembles an attorney, or a guardian ad litem, by whom a suit is brought or defended in behalf of another." *Morgan v. Potter*, 157 U.S. 195, 198 (1895); *See also X.D. by De Leon v. Totally Kids Learning Ctr*., No. 1:24-CV-051, 2024 WL 4093215, at *5 (S.D. Tex. Aug. 12, 2024), *report and recommendation adopted sub nom. X.D. by De Leon v. Totally Kidz Learning Ctr.*, No. 1:24-CV-00051, 2024 WL 4068763 (S.D. Tex. Sept. 5, 2024). Though Defendant refers to "Plaintiffs" in Defendant's Motion, Plaintiff's Complaint clearly lists W.L. as the only Plaintiff (Dkt. #1, at p. 2). Also, Plaintiff lists his parents as bringing this suit in their capacity as next friends and mentions nothing about their potential individual claims (Dkt. #1, at p. 2). As such, when the court refers to "Plaintiff," it only references W.L.

deficit hyperactivity disorder ("ADHD") (AR 4; Dkt. #17, at p. 1). In April 2024, Plaintiff additionally qualified for services related to dysgraphia (AR 4). Plaintiff also "demonstrates problems with aggression and toileting" (AR 4). Based on Plaintiff's parents' private psychological evaluation in December 2020, Plaintiff was diagnosed with "cognitive abilities in the average range and met diagnostic criteria for a developmental coordination disorder, with implications for handwriting, general coordination, and larger scale movements" (AR 5). During that evaluation, Plaintiff demonstrated "a persistent motor tic disorder…disruptive mood dysregulation disorder and an autism spectrum disorder" (AR 5).

**1. Sixth Grade**

In the 2021-2022 school year, Plaintiff was in the sixth grade (AR 5). Plaintiff's annual Admission, Review, & Dismissal ("ARD") committee meeting occurred on May 19, 2022 (AR 5). There, it was determined that Plaintiff "continued to be eligible for services under the IDEA in the areas of autism, OHI, and speech. [Thus, moving forward Plaintiff] was placed in a special education setting for English language arts reading (ELAR), math, and social skills, and in a general education environment for physical education (PE), science, social studies, and art" (AR 5). Plaintiff's Individualized Education Plan ("IEP") for the year "had goals related to reading, math, and speech, as well as six goals relating to behavior" (AR 5). He had various accommodations, inclusion support, counseling, and occupational therapy ("OT") (AR 5).

At the beginning of sixth grade, Plaintiff's Measures of Academic Progress ("MAP")[2] score in reading placed him in the 54th percentile, which approximates a reading level at "the end

[2] "The MAP is a norm-referenced test used by [Defendant] to look at academic achievement. It is provided three times a year and compares students to other students in the same grade level who took the assessment" (AR 5).

of 5th grade/beginning of 6th grade" (AR 6, 234). In the middle of sixth grade, Plaintiff tested at the 18th percentile and at the end of sixth grade, Plaintiff tested in the 19th percentile (AR 5, 234).

At the beginning of sixth grade, Plaintiff's MAP score in math placed him in the 12th percentile (AR 235). His Winter MAP score placed him in the 37th percentile, and his Spring MAP score was in the 39th percentile (AR 235). Based on this progress, Plaintiff placed in the 99th percentile for growth (AR 6, 235).

Regarding his behavior during the 2021-2022 school year, Plaintiff's ARD committee noted that he "need[ed] verbal prompting in order to actively participate in class or complete his assignments…[was] very easily distracted in class…and [became] upset when he [was] told he [could not] play [] during class" (AR 235). When Plaintiff "[did] not want to comply with [a request], or when he [did] not want to complete his assignments," he "[had] verbal outburst[s,] cussing at staff and peers or flipping them off" (AR 236). Further, during the school year, Plaintiff was "physically aggressive towards staff and or peers on many occasions. [Plaintiff's] physical aggression include[d] hitting, kicking, biting, throwing things such as his chromebook and threatening to stab people with pencils or pens" (AR 236).

In terms of his functional analysis during his sixth grade year, Plaintiff's ARD committee found that that he "need[ed] reminders to complete his hygiene at school. There [were] several incidents of him having accidents in his pants and needing staff to remind him to clean himself. According to [Plaintiff's] parents, he has encopresis which often times leads to him having an odor while at school. [Thus, Plaintiff] need[ed] to use the restroom on a consistent basis between every class to ensure that he [was] staying clean" (AR 236).

Plaintiff's State of Texas Assessments of Academic Readiness ("STAAR") testing indicated that he only approached his grade level expectations in math but did not meet them in

reading (AR 367). Regardless, Plaintiff was "promoted to grade 7" at the end of the school year (AR 637).

### 2. Seventh Grade

In the 2022-2023 school year, Plaintiff was in the seventh grade (AR 6). During that school year, Plaintiff had two ARD committee meetings, a revision meeting and his annual meeting. On November 4, 2022, during the revisional ARD committee meeting, changes to Plaintiff's accommodations and schedule of services were discussed (AR 277). The meeting was called because Plaintiff was experiencing behavioral issues (AR 277). As such, changes were made so Plaintiff could "leave the classroom setting to go to the [structured academics and interpersonal learning ("SAIL")] classroom when he [was] frustrated or over-stimulated" (AR 277). Moreover, 45 minutes of inclusion for special education was removed because he was not "showing a need for that high level of inclusion in the resource classes" (AR 277). Finally, "accommodations were added to help with his handwriting difficulties" (AR 277).

On April 28, 2023, Plaintiff's annual ARD meeting for the seventh grade was conducted (AR 7). Plaintiff's parents did not attend this meeting (AR 315). Plaintiff's Fall MAP score in reading placed him in the 37th percentile, while his Winter MAP score placed him in the 26th percentile (AR 288, 291). During the Fall, Plaintiff's MAP score in math was at the 13th percentile (AR 292). In the Winter, Plaintiff's math MAP score was in the 32nd percentile (AR 292). Thus, Plaintiff reached the 98th percentile for growth in math (AR 289). However, in math class, Plaintiff was "very disruptive and [would] cuss and scream around the other students. When he [was] given any math expectation, this cause[d] his behavior to escalate. His behavior strongly interfere[d] with his learning and the ability of his peers to learn" (AR 290).

In Plaintiff's Winter MAP, he scored in the 12th percentile for language arts (AR 292). Moreover, during his writing class, Plaintiff reportedly

> refuse[d] to write, type, or complete work most days in this class. He [was] extremely disruptive daily. Some of his behaviors include[d] cursing out teachers/students, throwing items at teachers/students, crying, screaming, laying on the floor, twitching, etc. He [did] not participate in class, use time wisely, work well in a group, work independently, request assistance, or follow class rules. These behaviors significantly impact[ed] the learning of the other students in the class. Due to these behaviors, [Plaintiff was] …removed from Writing class almost daily

(AR 289).

The ARD committee also discussed Plaintiff's behavior during the seventh grade. He had "outburst[s] in class and [] cussed at teachers/paras…[Plaintiff] [] used physical aggression towards paras including hitting (2 times/year), kicking (1 time/year), and throwing items (1 time/year). [Plaintiff] ha[d] these verbal and physical aggression towards others when a request [wa]s made that he [did] not want to comply to" (AR 290). Regarding Plaintiff's functional ability, it was determined that Plaintiff "require[d] assistance with using the restroom on a consistent basis." *Id*.

Plaintiff did not meet expectations in his seventh grade STAAR testing in math or reading (AR 8). Based on Plaintiff's seventh grade year, accommodations were added to "consider [Plaintiff's] effort/participation as part of his grade and to have no grade below 70 in the gradebook for a district assessment after retake and/or review of missed items" (AR 7). Additionally, Plaintiff was "moved to the [SAIL] classroom for math and writing due to data indicating [Plaintiff's] behavior was affecting the learning of himself and others" (AR 7). Despite this, Plaintiff was promoted to the eighth-grade (AR 638).

Plaintiff's Behavior Intervention Plan ("BIP"), as of April 28, 2023, noted that Plaintiff had a medical necessity for personal care services which necessitated "a program that provides

constant supervision throughout the day" (AR 321). This was, in part, because Plaintiff "need[ed] to be prompted/reminded to use the restroom during each passing period as well as when he gets to school in the morning" (AR 321). The BIP noted that a failure to provide such assistance would result in "poor personal hygiene related to encopresis" (AR 322).

### 3. Eighth Grade

During the 2023-2024 school year, Plaintiff was in the eighth grade (AR 8). During that school year, Plaintiff had three ARD committee meetings—a revision meeting and his annual meeting split between two sessions (AR 8). The revisional meeting took place on December 20, 2023 (AR 348). The meeting was called due to Plaintiff's "increase[d] verbal outbursts, physical aggressions, refusal to work, [] other behaviors, [] not being successful in Partner's PE," and "showing issues and a need to focus on bathroom procedures" (AR 352). Notably, on December 11, 2023, Plaintiff "struck another student on the arm during PE Partners, an elective class" (AR 8). The revisional meeting resulted in Plaintiff's placement in a study skills class in a SAIL classroom instead of Partner's PE, a new hygiene goal with objectives, and a hygiene contract (AR 8, 352).

Outside of the school-based consequences that Plaintiff incurred for striking another child in PE, a juvenile criminal action was filed against Plaintiff (AR 817). This led to a court mandated session with a behavioral psychologist at Alpha Autism Therapy (AR 771). During this session, Plaintiff mentioned that "his tantrums have reached a level of intensity where the school staff [wa]s forced to restrain him" (AR 771). In the behavioral psychologist's opinion, at home, Plaintiff

> would [] benefit from receiving Applied Behavior Analysis (ABA) Therapy with appropriately certified professionals. The goal of ABA is to increase desirable behaviors and decrease behaviors which negatively affect his day to day. ABA can increase his language and communication skills, attention, focus, social skills, memory, all while decreasing his problem behaviors. The extra help/knowledge can assist [Plaintiff] socially, including his inability to be flexible at time.

(AR 772). However, the behavior psychologist also recommended that Plaintiff receive "[i]n-School ABA for many of the same reasons mentioned above" (AR 773). The behavior psychologist concluded the report by stating that he

> highly recommend[ed] the implementation of Applied Behavior Analysis (ABA Therapy) in both the home and school setting. ABA therapy is a method of behavior modification which seeks to apply our understanding of how behavior works in real and practical situations. In plain English, it helps individuals understand their behaviors and its effect on the world around them. The goal of ABA is to increase desirable behaviors and decrease problematic behaviors which affect the learning and social environment. Through ABA therapy [Plaintiff] can increase his language and communication skills. He can also improve his social skills, flexibility, focus, memory, usage of coping skills, and his ability to problem solve. It would also provide help in identifying his triggers and provide nearby to help to prevent similar incidents from occurring.

(AR 773). Based upon this, the judge in Plaintiff's juvenile criminal case recommended ABA therapy (Dkt. #13-1, at p. 2).

On February 28, 2024, the first portion of Plaintiff's annual ARD meeting was held (AR 8). Plaintiff's parents and an advocate, Debra Liva ("Liva"), attended this meeting (AR 8). Plaintiff's Fall reading MAP scores indicated he was in the 1st percentile, and his Winter scores placed him in the 15th percentile (AR 573). Thus, he was in the 99th percentile for growth based on his improvement between the two tests (AR 362, 573). The Winter MAP test showed that Plaintiff scored in the 27th percentile for achievement and 93rd percentile for growth in language arts/written expression (AR 12, 364). Finally, his math MAP scores demonstrated that Plaintiff began the year in the 1st percentile and moved to the 27th percentile for achievement by the Winter MAP test (AR 571). In math he also tested into the 99th percentile for growth (AR 364).

Plaintiff's Lexile level at the beginning of eighth grade indicated that he read at the level of a second or third grader (AR 12). Plaintiff tested into the same range during the Winter of 2023

(AR 12). Plaintiff's STAAR testing showed that he "did not meet grade level in math, reading language arts, or science, and was approaching grade level in social studies" (AR 13, 828-35).

As of April 2024, Plaintiff still struggled with "visual motor skills and producing legible handwriting. [Plaintiff] demonstrate[ed] inconsistent pressure, sizing, spacing, line orientation and letter formation when producing written responses" (AR 363). In terms of his written expression, Plaintiff was described as "more than capable of participating in and completing writing assignments. However, his handwriting [was] illegible when he handwr[ote] his work and he usually refuse[ed] to use electronic accommodations available to him to do his writing" (AR 364). The ARD committee also noted that Plaintiff "ha[d] difficulty with bathroom related self help skills including continent toileting and hand hygiene" (AR 363).

The assessment of Plaintiff's eighth grade behavior demonstrated that he "show[ed] aggressive behaviors with the use of verbal outburst[s], physical aggressions, and non-compliance with following his restroom/hygiene routine and expectations. [Plaintiff] [could become] very agitated and upset when he [was] requested to go to the bathroom, use the bathroom, or change his soiled clothes/pull-ups…[Plaintiff] [could] also get very upset and agitated when he [felt] hungry" (AR 364-65). Moreover, during the year, Plaintiff "broke[] and damaged multiple chromebooks…due to being upset about not getting to participate in a free time activity during work time, getting something wrong while playing an online game, or the computer 'glitching' or having issues" (AR 365). Plaintiff's disciplinary records show that he had seven behavioral incidents, though some fell into multiple behavioral issue categories (AR 12). Those include

> [t]hree incidents involve[ing] [Plaintiff] smelling of urine or feces, five incidents involv[ing] [Plaintiff] being disruptive or disrespectful, and three incidents involv[ing] [Plaintiff] striking someone, either directly or with an item. [Plaintiff] received an out of school suspension for throwing a pencil at a staff member and another out of school suspension for striking another student on the arm in PE

> Partners. [Plaintiff] also received an in-school suspension for an incident involving threatening to hit a teacher with a chair.

(AR 12-13, 672-73).

Additionally, it was noted once more that Plainitff "struggle[d] with maintaining a healthy level of hygiene…[he] [did] not use the bathroom in the toilet on his own and is [in] need of a hygiene contract and routine to use the bathroom at school" (AR 365). When he soiled himself and refused to change, Plaintiff "[could] become verbally aggressive and physically aggressive towards school staff" (AR 365).

At the first portion of the annual ARD meeting, Liva stated that Plaintiff was not successful at the school and was not progressing (AR 390). Accordingly, Liva detailed that in her opinion Defendant was "not equipped to provide [Plaintiff] with needed services" (AR 390). Defendant's employee, Ms. Lawrence, Plaintiff's case manager, disagreed with the assessment that Plaintiff was not making progress but did note that "his behavior continue[d] to be problematic" (AR 390). When the parents were asked about their concerns with Plaintiff's functioning, they detailed that they were worried about his "physical aggression, hygiene issues, [] court proceedings due to violent behavior[, and] how many times they have been called up to the school to address [Plaintiff's] behavior and/or take him home due to hygiene issues" (AR 390).[3]

Approximately one hour into this meeting, Liva "stated that she wanted to discuss placement at a non-public day school, Behavior Network" (*See* Dkt. #16, at p. 9; AR 390). The committee reviewed Plaintiff's schedule of services and summarized that Plaintiff was "placed on a general education campus with the support of personnel in the SAIL classroom. [He] accesse[d] the general education settings and classrooms with support. He [had] access to non-disabled peers

[3] The school only had a record of two occasions that Plaintiff's parents were asked to take him home, though there was no data on how often they were called to provide a fresh set of clothing for Plaintiff after he soiled himself (AR 390).

and non-academic and extracurricular activities when [his] behavior [did] not interfere with his learning or the learning of others" (AR 390). However, Defendant "proposed [an] additional assessment to collect data to determine if changes [were] needed to the IEP based upon parent concerns" (AR 391). "The following evaluations were proposed with [Plaintiff's] parent[s] indicating agreement: speech/language, functional behavior assessment, health/medical (OHI form), in-home training, cognitive, adaptive behavior (parent and teacher), academic achievement (including Dysgraphia), and occupational therapy evaluation" (AR 391). This was a Full and Individual Evaluation ("FIE"), which would serve as Plaintiff's 3-year re-evaluation (AR 391). Plaintiff's parents rejected "[a]n updated Autism evaluation, as well as additional evaluation in the area of Emotional Disturbance due to diagnosis of anxiety (per OHI form dated 2021)" (AR 391).

The continuation of Plaintiff's annual ARD meeting occurred on April 25, 2024, after the FIE was conducted (AR 391). Liva and Plaintiff's parents attended this meeting once more (AR 391). The parties began the meeting by reviewing the FIE results with a speech pathologist, school nurse, occupational therapist, emotional behavior support specialist, and educational diagnostician (AR 391-92).[4] The results showed that Plaintiff continued to meet the criteria for "a student with a speech impairment in the areas of expressive, receptive, and pragmatic language," "[OHI] due to ADHD and motor tic disorder," "[a]utism," and "[s]pecific [l]earning [d]isability in the area of written expression due to dysgraphia" (AR 391-92). The review of the FIE took place from 12:30 p.m. to 3:15 p.m. (AR 393).

After the results of the FIE were discussed, Liva raised the issue of "placement outside of the school district" (AR 392). In response, the special education coordinator informed Liva that the ARD committee would draft an IEP that addressed outside placement, but that discussion

[4] The board certified behavior analyst was not able to attend the meeting on the scheduled date, and Plaintiff's parents declined to have a phone call with her prior to the meeting to discuss Plaintiff's emotional behavior results (AR 392).

would come after the parties discussed the "development of goals, accommodations, and other components of the IEP" (AR 392). Liva responded that "[Defendant] [was] not required to go through these steps in that order and that the parents would like to know the placement determination" (AR 392). When the special education coordinator informed Liva that the placement discussion would take place later in the meeting, Liva "continued to demand that [Defendant] inform the parent if [Plaintiff] will be placed at a non-public day school" (AR 392). The special education coordinator expressed that the committee could not consider that placement until the IEP was developed and supported that placement (AR 392-93).

After a subsequent break, Liva stated that Plaintiff's parents "waive[d] the right to participate in developing the IEP and want[ed] to discuss placement" (AR 393). However, Defendant's employees "refused the request to move forward to a discussion about placement without addressing the other portions of the IEP first," and explained that there should be time for such a discussion before the meeting concluded (AR 393). This led to Liva and Plaintiff's parents exiting the meeting, knowing that the meeting would continue and the committee would develop an IEP without their input (AR 393).

Thus, the following was discussed and accomplished by the committee:

> Drafted goals were reviewed and accepted. Drafted accommodations and the Behavior Intervention Plan were reviewed, modified with input from the committee members, and accepted. The committee reviewed state-district testing needs and planned for future state/district assessments with accommodations. Least restrictive environment was discussed. [Plaintiff] continues to demonstrate a need for modified instruction in reading and math and specialized support to implement the behavior intervention plan. [Plaintiff] benefits from access to his grade level peers in the general education setting.

(AR 393). Ultimately, the committee reached the placement determination that "a non-public day school [was] not the least restrictive environment in which [Plaintiff] [could] be educated…[h]is needs [could] be met on a general education campus" (AR 396).

### *B. Plaintiff's IEP Progress*

Defendant's tracking of Plaintiff's progress in his IEP goals was minimal and inconsistent (AR 332-43, 640-71). To begin with, no progress reports by IEP goal were included for Plaintiff's sixth grade year. Rather, informal evaluations were provided with data points about Plaintiff's progress in a few IEP goal areas (AR 265-66).

The most IEP progress reports were from Plaintiff's seventh grade year, but many were repetitive. Further, most were incomplete. For instance, five of Plaintiff's seventh grade IEP goals specifically stated that "[b]y the end of 36 instructional weeks…" Plaintiff was intended to be able to perform a task or achieve a goal (AR 336, 646, 648-51, 665-68). None of these goals were measured over thirty-six weeks; at most, a goal was measured on two separate instances (AR 336, 646, 648-51, 665-68). The court also received progress reports from seven other IEP goals that were meant to be measured during Plaintiff's seventh grade year (AR 332-35, 337-43, 347, 640-45, 661-64). These goals were qualified in such a manner that, "[b]y the next annual ARD" Plaintiff should be able to perform a task or achieve a goal (AR 332-35, 337-43, 347, 640-45, 661-64). Again, these goals were not tracked throughout the entire year (AR 332-35, 337-43, 347, 640-45, 661-64). At most, Defendant's employees recorded five sets of data points (AR 661-62). The five sets of data points were measured from February 24, 2023, to May 12, 2023 (AR 661-62). Of the twelve inaccurately measured goals, Plaintiff demonstrated progress in four, regressed in one, and showed no progress in seven[5] (AR 640-42, 644, 646, 648-49, 650-51, 661-62).

The court received progress reports for nine separate IEP goals for Plaintiff's eighth grade year (AR 652-60, 669-71). One goal was meant to be measured "[w]ithin *each* 9 weeks" (AR 652)

[5] Plaintiff had one data point recorded and demonstrated no progress in four areas (AR 647-48, 650-51). Plaintiff had multiple data points recorded and demonstrated no progress in three areas (AR 624, 661-62).

(emphasis added).[6] However, data was only collected for eight weeks on one instance (AR 652). Moreover, only four measurements were taken during those eight weeks (AR 652). No progress was recorded in this goal (AR 652). The other eight goals were meant to be measured "[w]ithin 36 instructional weeks" (AR 653-60, 669-71). None of these goals were measured for the requisite time period (AR 652-60, 669-71). At most, two goals were measured for twenty-six weeks with twelve different data points collected (AR 669-70). Of these eight goals, Plaintiff demonstrated progress in three, regressed in two, and had no progress in three areas (AR 655-59, 669-71).

Plaintiff had several IEP goals that stayed the same from sixth to eighth grade. Importantly, in the area of social/emotional and adaptive behavior, a consistent goal of Plaintiff's was that

> [d]uring a moment of frustration, given a list of pre-taught calming strategies, [Plaintiff] will select a strategy to use with no more than 1 prompt within 15 seconds and not become verbally or physically aggressive in at least 50% [or 70%] of opportunities.

(AR 265). In the sixth grade, Plaintiff maintained a 31 percent accuracy rate when the goal was 50 percent (AR 265). In the seventh grade, this goal was meant to be measured "[b]y the next annual ARD" (AR 332, 642, 663). However, the Administrative Record ("Record") only supports the measurement of this goal from March 13, 2023, to May 25, 2023 (AR 642). Further, only three data points were recorded during that period (AR 642). Plaintiff started at 70 percent and fell to 60 percent when the goal was 50 percent in the seventh grade (AR 332-33). The goal was raised to 70 percent when Plaintiff entered the eighth grade (AR 669). During the eighth grade, this goal was meant to be measured "[w]ithin 36 instructional weeks" (AR 653, 669). However, the provided progress report spanned from August 25, 2023, to March 1, 2024, and thus, only

[6] "[T]hrough discussion and activities with the counselor, [Plaintff] will identify triggering situations at school and participate in practicing pro-social communication and coping strategies he can use for increased self-regulation in the school setting, in 4/5 trials" (AR 652). The Special Education Hearing Officer ("SEHO") used Plaintiff's lack of progress in this goal to establish that Plaintiff "struggle[d] with identifying triggering situations" (AR 225).

measured twenty-six weeks (AR 669). Further, during the twenty-six weeks, twelve data points were recorded (AR 669). At the beginning of eighth grade, without assistance, Plaintiff first achieved a 70 percent success rate (AR 669). However, Plaintiff's progress fell over the measured period, and by the end of the eighth grade he was only able to meet the goal approximately 50 percent of the time (AR 669). Accordingly, Plaintiff's ability to calm himself down during moments of frustration and proactively prevent verbal and physical aggression, declined from his seventh to eighth grade year (See AR 642, 669). By the end of his eighth grade year, Plaintiff was only achieving the behavioral expectation set forth for him in his sixth grade year.

However, a closer examination of the record reveals that the ARD committee determined that Plaintiff's "[s]elf-[r]egulation[] progress [was] supported" based on Plaintiff's achievement in this area during his eighth-grade year (AR 401). The graph attached to that portion of the record mirrors the dates and most of the data that is contained in other portions of the record, except for the last data point (AR 401, 653, 669). In the progress report that was provided separately in the Record, Plaintiff finished the eighth-grade year at 50 percent (AR 669). However, in the report that the ARD committee based its determination upon, Plaintiff ended the eighth-grade year at 80 percent (AR 401). This inconsistency is not explained, but the SEHO recognized the regression in this goal from August 2023 to February 2024, from 70 percent to 50 percent, in his decision (AR 225).

While the reason for this discrepancy between the reports is not clear, it is clear that Plaintiff's progress in this area was neither linear nor consistent (AR 401, 653, 669). Moreover, Plaintiff's progress was not measured over the course of thirty-six weeks, as this IEP goal required (AR 401, 653, 669). As demonstrated above, none of Plaintiff's IEP goals, based on the progress reports in the Record, were properly measured.

### *C. The Due Process Hearing and the SEHO's Decision*

On May 14, 2024, Plaintiff filed a Request for Special Education Due Process Hearing (AR 34). On September 3-4, 2024, the SEHO held the due process hearing (AR 913-1278). Plaintiff and Defendant were represented by counsel (AR 914). On October 4, 2024, the SEHO issued a decision (AR 31) and detailed extensive Findings of Fact (AR 4-31). Based on the Findings of Fact, the SEHO made four determinations: 1) Plaintiff "did not meet his burden to prove that District failed to provide [him with] a FAPE during the relevant time period or that [his] IEP was not reasonably calculated to address his needs in light of his unique circumstances;" 2) Plaintiff "did not meet his burden to prove that [Defendant] failed to timely identify [Plaintiff] in all areas of known or suspected disability;" 3) Plaintiff "did not meet his burden to prove that [Defendant] predetermined aspects of [Plaintiff's] IEP or placement;" and 4) Plaintiff "did not meet his burden to prove that the proposed private placement was appropriate" (AR 31).

### *D. The Instant Suit*

On January 2, 2025, Plaintiff filed the instant suit in the Eastern District of Texas (Dkt. #1). On March 25, 2025, the School filed an Answer (Dkt. #3). On July 11, 2025, Plaintiff filed a Motion for Leave to file Additional Evidence (Dkt. #11), which was granted on August 3, 2025 (Dkt. #12). Accordingly, on August 18, 2025, Plaintiff filed additional evidence under seal (Dkt. #13). On September 24, 2025, the School filed a Motion for Summary Judgment (Dkt. #16). On the same day, Plaintiff filed a Motion for Judgment on the Administrative Record (Dkt. #17). On October 15, 2025, the parties each filed a Response to the respective Motions (Dkt. #18; Dkt. #19). On October 29, 2025, Plaintiff filed a Reply brief (Dkt. #20).

### *E. Additional Evidence*

The additional evidence that Plaintiff filed under seal consists of Individualized Treatment Plans and progress notes from Behavior Network (Dkt. #13-1). Based on the records provided by Behavior Network, Plaintiff received ABA therapy treatment from February 2, 2025, to approximately March 10, 2025, and then again from March 24, 2025 until June 2, 2025 (Dkt. #13-1, at p. 11). It was noted that Plaintiff's parents' insurance had changed "mid-authorization" in June 2025 (Dkt. #13-1, at p. 5). The attached records were generated in June 2025 and included a recommendation for continued treatment until December 2, 2025 (Dkt. #13-1, at p. 67).

Plaintiff was homeschooled his ninth grade year, and he "was admitted to inpatient at Meridel Achievement Center for 40 days, December 2024 – January 2025 following an aggressive episode at his home where the police were called to intervene" (Dkt. #13-1, at p. 2). Shortly afterwards, Plaintiff began treatment with Behavior Network, "a crisis clinic [that] frequently provides ABA therapy to consumers with various intense problem behaviors" (Dkt. #13-1, at pp. 5-6). The purpose of Plaintiff's enrollment at Behavior Network was to correct "problem behavior engagement, lack of social emotion reciprocity/interpersonal skills, and low motivation and cooperation with adult directed instruction…[to] provide [Plaintiff] [with] a much better skill set to cope with the demands of the educational and home setting" (Dkt. #13-1, at p. 5).

The evidence provided by Plaintiff only indicates that he receives ABA therapy through Behavior Network and is separately being homeschooled (Dkt. #13-1, at p. 2; AR 4). However, the court takes judicial notice of Behavior Network's website and publicly published information. FED R. EVID. 201. Behavior Network offers two educational programs.[7] The first, "an accredited

[7] *Services We Offer*, BEHAV. NETWORK, https://www.behaviornetwork.net/services#ID-Private-School (last visited May 20, 2026).

private school program designed for students who benefit from a therapeutic learning environment that integrates individualized academics and evidence-based behavioral supports."[8] The second, a TEA "approved non-public school program that offers specialized services to support students to meet their educational needs including social, emotional and behavioral needs."[9]

## II. LEGAL STANDARD

### *A. IDEA Framework*

IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education." *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 965 (5th Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)). More specifically, "IDEA compels those states receiving federal funding to educate children with disabilities 'to the maximum extent appropriate…with children who are not disabled,' and to do so 'in the least restrictive environment consistent with their needs.'" *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 925 (W.D. Tex. 2008) (quoting 20 U.S.C. § 1412(a)(5); *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 (5th Cir. 1993)). "Because the State of Texas receives federal education funding, all school districts within its borders must comply with the IDEA." *Richard R.*, 567 F. Supp. 2d at 925 (citing *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247 (5th Cir. 1997).

However, IDEA "guarantees only a 'basic floor' of opportunity, 'specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction.'" *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012) (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 188–89

---

[8] *Id.*

[9] *Id.*

(1982)). "One of the components of a FAPE is 'special education,' defined as 'specially designed instruction . . . to meet the unique needs of a child with a disability.'" *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE–1*, 580 U.S. 386, 401 (2017) (quoting 20 U.S.C. § 1401(9), (29)). "Once a school accepts that one of its students is eligible under the IDEA, the school must develop an IEP for that student." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017) (citing *Michael F.*, 118 F.3d at 247). An IEP is the vehicle in which the required FAPE "'is tailored to the unique needs' of a particular child." *Endrew F.*, 580 U.S. at 391 (quoting *Rowley*, 458 U.S. at 181) (internal quotation marks omitted).

More specifically, the IEP is a written statement that is prepared at a meeting of qualified representatives of the local educational agency, the child's teacher, parent or parents, and where appropriate, the child. 20 U.S.C. § 1414(d)(1)(A)–(B). The creation of an IEP involves "the student's parents, teachers, and counselors working together to determine what is best for the child." *A.L. v. Alamo Heights Indep. Sch. Dist.*, No. SA–16–CV–00307–RCL, 2018 WL 4955220, at *1 (W.D. Tex. Oct. 12, 2018) (citing 20 U.S.C. § 1414(d)). "The IEP includes a statement of the special education, related services and accommodations the school will provide to the child." *Hovem*, 690 F.3d at 395 (citing 20 U.S.C. § 1414(d)(1)(A)). "An IEP need not be the best possible one, nor does it entitle a disabled child to a program that maximizes the child's potential." *Id.* at 396 (citing *Michael F.*, 118 F.3d at 247–48). "Nevertheless, a school district must provide the student with a meaningful educational benefit." *Id.* (citing *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009)). And after "school officials and parents agree on the IEP, the school district must put it into effect." *Id.* at 395 (citing 20 U.S.C. § 1414(d)(2)(A)).

Under IDEA, parents are afforded "[a]n opportunity [] to present a complaint… with respect to any matter relating to the identification, evaluation, or educational placement of the

child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). When a complaint has been presented, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency…" *Id.* at § 1415(f)(1)(A). In Texas, due process hearings are only heard by the Texas Education Agency ("TEA"). TEX. ADMIN. CODE § 89.1151(b). When analyzing whether a defendant provided a plaintiff with a FAPE, the SEHO looks to the *Michael F.* factors. 118 F.3d at 253. Those include:

- Whether the program is individualized on the basis of the student's assessment and performance;
- Whether the program is administered in the least restrictive environment;
- Whether the services are provided in a coordinated, collaborative manner by the key stakeholders; and
- Whether positive academic and non–academic benefits are demonstrated.

*Id.*

"If the court finds that the state has not provided an appropriate educational placement, the court may require the school district to reimburse the child's parents for the costs of sending the child to an appropriate private school *or institution*." *V.P. ex rel. Juan P.*, 582 F.3d at 584 (emphasis added); *See* 20 U.S.C. § 1412(a)(10). This may occur "[w]hen parents unilaterally remove their child from a public school…" *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 292 (5th Cir. 2009). "To qualify for such reimbursement, Plaintiff must show "that (1) an IEP calling for placement in a public school was inappropriate under the IDEA [per the *Michael F.* factors], and (2) the private school placement…was proper under the Act." *V.P. ex rel. Juan P.*, 582 F.3d at 584 (citation omitted). In the Fifth Circuit, a two-part test is utilized to determine if a private placement in an institution is proper and can be reimbursed. *Michael Z*, 580 F.3d at 299. "[T]he placement must be 1) essential in order for the disabled child to receive a meaningful

educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Id.*

Any party aggrieved by a decision of a SEHO has the right to appeal the decision to the district court.[10] 20 U.S.C. § 1415(i)(1)(A).

### *B. Standard of Review*

An IDEA appeal "essentially asks the Court to decide the case based on the administrative record." *Caldwell Indep. Sch. Dist. v. L.P.*, 994 F. Supp. 2d 811, 817 (W.D. Tex. 2012) (citing *Austin Indep. Sch. Dist. v. Robert M.*, 168 F. Supp. 2d 635, 638 (W.D. Tex. 2001)). A district court reviews the SEHO's determination "virtually *de novo*." *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 213 (5th Cir. 2019) (quoting *Teague*, 999 F.2d at 131). "[A]lthough the district court is to give due weight to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Id.* (quoting *Woody*, 865 F.3d at 309) (cleaned up).

In reaching its decision, the court must "receive the records of the administrative proceedings and, basing its decision on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate." *Id.* (quoting 20 U.S.C. § 1415(i)(2)(C)) (internal quotation marks omitted). Additionally, the court is "required to take additional evidence at the request of any party." *Michael F.*, 118 F.3d at 252. Then, the court must consider whether the "student had a present need for special education services, such that the reviewing court should not judge a school district's determination in hindsight." *Lisa M*, 924 F.3d 205 at 214 (quoting *D. L. by & through*

[10] "[T]he plain language of the IDEA provides that any party aggrieved by the findings and decision of a due process hearing brought pursuant to IDEA 'shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.'" *E.M. v. Lewisville Indep. Sch. Dist.*, No. 4:15–CV–00564, 2018 WL 1510668, at *8 (E.D. Tex. Mar. 27, 2018) (quoting 20 U.S.C. § 1415(i)(2)(A)); *see also* 20 U.S.C. § 1415(i)(1)(A); 34 C.F.R. § 300.516.

*J.L. v. Clear Creek Indep. Sch. Dist.*, 695 F. App'x 733, 738 (5th Cir. 2017), *as revised* (July 31, 2017) (per curiam)) (internal quotation marks omitted). Rather than "second-guess the decisions of school officials or to substitute their plans for the education of disabled students with the court's," the judiciary's role in an appeal of the SEHO's determination is "limited to determining whether those officials complied with IDEA." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1011 (5th Cir. 2010) (citing *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir. 1996)). In other words, review under the IDEA "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *E.M.*, 2018 WL 1510668, at *5 (citing *Rowley*, 458 U.S. at 206) (internal quotation marks omitted). Indeed, because "Congress left the choice of educational policies and methods . . . in the hands of state and local school officials, the role of the judiciary under the IDEA is purposefully limited." *Lisa M.*, 924 F.3d at 213 (quoting *White ex rel. White v. Ascension Parish Sch. Board*, 343 F.3d 373, 377 (5th Cir. 2003) (internal quotation marks omitted)); *E.M.*, 2018 WL 1510668, at *5. The party challenging the SEHO's decision bears the burden of persuasion. *Seth B.*, 810 F.3d at 972.

### *C. Summary Judgment*

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses to help "secure the just, speedy and inexpensive determination of every action." *Nat'l Cas. Co. v. Kiva Const. & Eng'g, Inc.*, 496 Fed. App'x 446, 449 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'" *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). All inferences must be construed in the light most favorable to the nonmoving party. *See id.*; *Osprey Ship Mgmt. Inc. v. Foster*, 387 Fed. App'x 425, 429 (5th Cir. 2010). "[T]he substantive law will identify which facts are material. This means [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir.), *cert. denied*, 140 S. Ct. 653 (2019) (citing *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)) (internal quotations omitted).

The party moving for summary judgment has the burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191 (5th Cir. 2011). "[W]here the movant bears the burden of proof at trial, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (citation omitted). However, if the movant does not bear the burden of proof at trial, the movant is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Gonzales v. ConocoPhillips Co.*, 806 Fed. App'x 289, 291 (5th Cir. 2020) (citing *Celotex*, 477 U.S. at 323). Once the movant has carried its burden, the nonmovant "must go beyond the pleadings and identify specific evidence in the record showing that there is a genuine issue for trial." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Malbrough v. Stelly*, 814 Fed. App'x 798, 802 (5th Cir. 2020) (citing *Anderson*, 477 U.S. at 249–50).

## III. EVIDENCE PRESENTED

The Record includes the following:

- The SEHO's Decision (AR 1-32)
- Pleadings, Orders, and Disclosure Correspondence (AR 33-232)
- Joint Exhibits (AR 233-714)
- Plaintiffs' Exhibits (AR 715-837)
- Defendant's Exhibits (AR 838-873)
- Prehearing Telephone Conference Transcript, June 5, 2024 (AR 874-895)
- Prehearing Telephone Conference Transcript, July 26, 2024 (AR 896-912)
- Due Process Hearing, Volume 1 – September 3, 2024 (AR 913-1052)
- Due Process Hearing Volume 2 – September 4, 2024 (AR 1053-1278)

Plaintiff also presented evidence from Behavior Network in the form of its providers' notes treatment plan for Plaintiff (Dkt. #13-1).

## IV. ANALYSIS

Here, the court finds that Defendant did not substantially comply with IDEA, but Plaintiff failed to prove by a preponderance of the evidence that placement at Behavior Network was appropriate and necessitated reimbursement. Thus, the court finds that Defendant's Motion (Dkt. #16) be granted in part and denied in part, and Plaintiff's Motion (Dkt. #17) be granted in part and denied in part.

In reviewing a SEHO's decision, the court determines (1) whether the school district complied with IDEA's procedural requirements; and (2) whether the student's IEP is reasonably calculated to provide meaningful educational benefits such that the school district complied with IDEA's substantive requirements. *Hovem*, 690 F.3d at 396 (citing *Rowley*, 458 U.S.C. at 206–07). Here, Plaintiff alleges only substantive violations, and as such, the court need not reach the procedural analysis.

### *A. Defendant Failed to Provide a FAPE*

In addressing the substantive considerations of IDEA, the court looks to the four *Michael F.* factors to determine whether the IEP was substantively adequate. *Id.* (quoting *Michael F.*, 118 F.3d at 253). While the court is not required to consider or weigh these four *Michael F.* factors in any particular order, the Fifth Circuit has noted that the fourth factor is one of the most critical factors in this analysis. *Id.* at 396, 399. Having reviewed the *Michael F.* factors, the Record, and the parties' arguments, the court finds that Defendant did not substantively comply with IDEA because it failed to provide a FAPE.

#### 1. Factor One: Individualized

The first factor is whether the IEP was "individualized on the basis of the student's assessment and performance." *Id.* at 396. "This court's job is to determine 'whether the [IEP] is reasonable, not whether the court regards it as ideal.'" *Renee J. v. Hous. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 688 (S.D. Tex. 2017) (quoting *Endrew F.*, 580 U.S. at 399) (emphasis omitted).

With respect to the first factor, the SEHO found that Plaintiff "failed to prove that [his] IEP was not appropriately individualized" because

> [Plaintiff's] IEPs and BIPs were developed in ARD Committee meetings at which the parties reviewed [Plaintiff's] strengths, evaluation data, academic, developmental, and functional needs, and discussed Parents' specific concerns regarding [Plaintiff's] progress. [At the] February 2024 ARD Committee meeting, a new battery of evaluations were agreed to and conducted. This new evaluation data formed the basis of [Defendant's] most recent IEP and BIP.
>
> While [Plaintiff's] behavior impede[d] his learning and that of others, [Defendant] [] specifically considered positive behavioral interventions and supports and other behavioral strategies when developing [Plaintiff's] IEP and BIP. [Defendant] [] adopted strategies to help [Plaintiff] manage his behaviors…[T]hese strategies were individualized to [Plaintiff] and [were] designed to provide [Plaintiff] with a meaningful benefit likely to produce progress, not regression or trivial advancement.

> [Plaintiff] received classes in the special education environment, inclusion support in general education classes, speech therapy, OT, and significant adaptations to classroom instructions and assessments…Additional services were added at the November 2022 revision ARD Committee meeting to address writing concerns and at the December 2023 revision meeting to address hygiene concerns.
>
> [A] review of the IEP show[ed] that [Plaintiff] received specific accommodations and supports to address his writing needs, including assistance in proofing writing assignments, extra time, oral tests, and access to a word processor and word-prediction software.

(AR 18–21).

Plaintiff argues that Defendant failed "to provide an appropriate program based on mischaracterized data, [and that] demonstrates a failure to individualize [Plaintiff's IEP]" (Dkt. #17 at p. 14). According to the testimony of Plaintiff's witness, Annette Jerome, Ph.D. ("Jerome")[11], Plaintiff "needs very specialized individualized instruction," "highly individualized research-based intervention," and "intense individualized intervention in a highly predictable environment…administered by trained staff, administering research based techniques" (Dkt. #17, at p. 13). Plaintiff asserts that Jerome and Plaintiff's other witness, Alsberg Dorvilus ("Dorvilus"), a behavior psychologist, recommended this environment (Dkt. #17, at p. 14). Further, Plaintiff alleges that "he quickly began having success in curbing maladaptive behaviors" at Behavior Network because it "provided such an environment and such a program" (Dkt. #17, at p. 14). Plaintiff argues that Defendant did not provide this environment, nor could it (Dkt. #17, at p. 14).

Further, Plaintiff offered the testimony of Becky Hart ("Hart"), a Board-Certified Behavioral Analyst ("BCBA"), to support the proposition that Defendant failed to individualize Plaintiff's IEP (Dkt. #17, at p. 14). Hart testified that Plaintiff's "target behaviors were decreasing" according to his latest FBA measurement that took place after the February 28, 2024, portion of

[11] Dr. Jerome is a licensed psychologist in the State of Texas, specializing in school psychology. She is a Board Certified Behavior Analyst. (AR 1060).

Plaintiff's annual ARD meeting (Dkt. #17, at p. 14). Plaintiff alleges that this data was skewed because it only measured seventeen days in his eighth-grade year and conflicts with data that "showed that [Plaintiff's] behaviors in fact escalated between the 22-23 and 23-24 school years" (Dkt. #17, at p. 14). Thus, Plaintiff concludes that Defendant "denied [him] the sort of specialized instruction he needs, based on its hyperfocus of data collected over the course of 17 days, ignoring all other sources of data and assessment it could have looked at" (Dkt. #17, at p. 14).

Additionally, Plaintiff also asserts that Defendant failed to individualize Plaintiff's IEP, namely, the IEP developed at the end of Plaintiff's seventh grade year for his eighth grade year, because it incorrectly determined that Plaintiff did "not demonstrate a need for specialized instruction" in writing (Dkt. #17, at p. 15). Plaintiff claims that Defendant "was in possession of evaluation data [from Plaintiff's 2022 FIE (AR 1239-40)] which told [Defendant] that [Plaintiff] had a developmental coordination disorder, which was affecting his handwriting and general coordination, and caused his writing to be illegible" (Dkt. #17, at p. 15). Plaintiff claims in the eighth grade, he suffered as a result of this, did not make progress in writing, and was eventually moved to a "self-contained class for writing" (Dkt. #17, at p. 16). Further, to support this, at the end of Plaintiff's eighth grade year, he was deemed a "[s]tudent with a writing disability, dysgraphia" (Dkt. #17, at p. 16).

Finally, Plaintiff asserts that his IEP goals "were not individualized because they did not have appropriate baselines (or starting points) derived from data" (Dkt. #17, at p. 17). Plaintiff argues that Defendant frequently set an annual IEP goal at a level that Plaintiff was already achieving (Dkt. #17, at p. 17). As such, Defendant failed to "tailor the goal appropriately," neglecting to individualize Plaintiff's IEP (Dkt. #17, at p. 17).

Defendant argued that it individualized Plaintiff's IEP because it "completed timely FIEs and conducted additional evaluations when [Plaintiff's] performance indicated unidentified needs may exist. To address the deficits revealed in the evaluations, [it] developed and implemented IEP goals that were reasonably calculated to address those specific deficits" (Dkt. #16, at p. 16). Further, Defendant argues that it collaborated with Plaintiff and his parents, "continued to individualize the IEP and BIP between the annual ARD meetings," updated IEP goals, changed Plaintiff's placement, and "reviewed and revised [Plaintiff's BIP] on an ongoing basis to ensure that the IEP continued to be focused on addressing the specific needs of [Plaintiff] as those needs evolved throughout the school years" (Dkt. #16, at p. 16).

In terms of Plaintiff's diagnosis of dysgraphia, Defendant asserts that the Record demonstrates Plaintiff "was being served under the IDEA throughout the relevant time period" for writing issues (Dkt. #16, at p. 21). Specifically, Plaintiff began receiving services for dysgraphia after the April 28, 2023, ARD meeting (Dkt. #16, at p. 22). Further, Defendant claims that Plaintiff is complaining about the "label" attached to Plaintiff's IEP regarding his issues with writing, rather than the actual services provided (Dkt. #16, at p. 22). Defendant concludes that any alleged misidentification did not deny Plaintiff a FAPE, as long as the appropriate services were provided—and Defendant contends that they were (Dkt. #16, at p. 22).

"An IEP is sufficiently individualized when multiple assessments are conducted of the student, the ARD committee considers these assessments, as well as guardian and teacher input, in developing the student's IEP, accommodations and modifications are made based on the student's performance and guardian input, and the IEP goals are revised or added to based on new assessment data." *T.L. a/n/f J.M. v. Florence Ind. Sch. Dist.*, No. 1:18–CV–1016–RP, 2020 WL 4434928, at *6 (W.D. Tex. July 31, 2020) (citing *Z.C. v. Killeen Indep. Sch. Dist.*, No. W:14–CV–

086, 2015 WL 11123347, at *6 (W.D. Tex. Feb. 17, 2015)). The court finds that Defendant's conduct meets this standard.

Based on the Record before the court, multiple FIE assessments were conducted (AR 272, 417-636). In fact, an early FIE was conducted after the February 2024 ARD meeting to "collect data to determine if changes [we]re needed to the IEP based upon parent concerns" (AR 391). Further, ARD committee reports indicate that the FIE assessments were utilized when creating Plaintiff's IEPs (AR 233, 287, 361). Those reports also stated that information from school personnel, other agencies or professionals, Plaintiff, and Plaintiff's parents was reviewed when developing Plaintiff's IEPs (AR 233, 287, 361). Finally, during his seventh and eighth grade years, Plaintiff's IEP goals were revised, added to, and modified to accommodate his behavioral, academic, and hygiene issues (AR 265-66, 277, 332-43, 352, 640-71). Thus, given the standards set forth in *T.L.*, Plaintiff's IEPs were sufficiently individualized. *See id.*

**2. Factor Two: Least Restrictive Environment**

The next *Michael F.* factor asks whether the IEP was "administered in the least restrictive environment." *Hovem*, 690 F.3d at 396 (quoting *Michael F.*, 118 F.3d at 253). In analyzing this factor, the Fifth Circuit first asks whether the plaintiff "could be satisfactorily educated in the regular classroom with supplemental aids and services." *H.W. by & through Jennie W v. Comal Indep. Sch. Dist.*, 32 F.4th 454, 466 (5th Cir. 2022) (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). The first question turns on the following non-exhaustive factors,

> (1) 'whether the state has taken steps to accommodate the handicapped child in regular education';
>
> (2) 'whether the child will receive an educational benefit from regular education';
>
> (3) 'the child's overall educational experience in the mainstreamed environment, balancing the benefits of regular and special education for each individual child'; and

> (4) 'what effect the handicapped child's presence has on the regular classroom environment and, thus, on the education that the other students are receiving.'

*Id.* at 466 (citing *Daniel R.R.*, 874 F.2d at 1048-49).

If the child cannot be satisfactorily educated in the regular classroom with supplemental aids and services, then the inquiry becomes "whether the [defendant] mainstreamed [the student] 'to the maximum extent appropriate.'" *Id.* (citing *Daniel R.R.*, 874 F.2d at 1048). "To comply with [] IDEA, a [plaintiff's] plan must provide for exposure to nonhandicapped students to the maximum extent appropriate." *Id.* at 471. That is often determined by reviewing a student's "(1)…positive academic and non-academic benefits in general education; (2)…progress in a general education [and] special education setting; and (3)…behavioral issues" in those settings. *Id.* (citing *A. B. by & through Jamie B. v. Clear Creek Indep. Sch. Dist.*, 787 F. App'x 217, 223 (5th Cir. 2019); *Brillon v. Klein Indep. Sch. Dist.*, 100 F. App'x 309 (5th Cir. 2004)).

The SEHO found that Plaintiff "failed to prove, by a preponderance of the evidence, that [Defendant's] attempts to educate [Plaintiff] in a less restrictive environment [we]re inappropriate" because

> IDEA requires that [Plaintiff] be educated with non-disabled peers to the maximum extent appropriate. While many of [Plaintiff's] current courses [were] provided in more restrictive environments, [Plaintiff] [] receiv[ed] some of his classes in a general education environment and [was] scheduled to take his electives, social studies, and science in a general education environment with inclusion support during his 9th grade year.
>
> [T]hese general education placements would [have] be[en] appropriate because [Defendant] [would have] provid[ed] supplementary aids and services to allow [Plaintiff] to access these courses and [Plaintiff's] passing grades in similar coursework in the past is evidence that he [] receiv[ed] academic benefit from these courses. While his behavior does impact the learning of others, the evidence does not support a conclusion that the impact is great enough that [Plaintiff] should be denied the opportunity to be exposed to non-disabled peers…

(AR 23).

Plaintiff acknowledges that "neither party is arguing that [he] should be fully mainstreamed" (Dkt. #17, at p. 18). In fact, based on the factors outlined in *H.W.*, Plaintiff argues that he cannot "be satisfactorily educated in the regular classroom with supplemental aids and services" (Dkt. #17, at pp. 18-20). *See id.* Plaintiff claims that Defendant's proposed IEP for Plaintiff's ninth grade year placed him "in a restrictive environment, with no access to general education, for the vast majority of his schedule, including English, Fine Arts, Math, Social skills, study skills, and speech therapy" (Dkt. #17, at p. 18). However, Plaintiff advocates for a more restrictive placement (Dkt. #17, at p. 18). Plaintiff did not address the requirement that "'to the maximum extent appropriate,'" he be "expos[ed] to nonhandicapped students" (Dkt. #17; Dkt. #19). *Id.* (citing *Daniel R.R.*, 874 F.2d at 1048).

Defendant asserts that "[a]s evidenced by the ARD committee deliberations, [its] final placement decision followed an attempt to educate [Plaintiff] in a less restrictive environment" as required by the Fifth Circuit (Dkt. #16, at p. 11). During the November 4, 2022, ARD meeting, Defendant "reduced the restrictiveness of [Plaintiff's] program based on progress that was shown" (Dkt. #16, at p. 11) after the May 19, 2022, ARD meeting. However, the revision was later revoked after proving unsuccessful (Dkt. #16, at p. 11). The committee found that Plaintiff's behaviors were impeding his and his peers' ability to learn (Dkt. #16, at p. 11).

Defendant concludes by asserting that "Plaintiff[] [] presented no compelling evidence that [he] require[d] [a] more restrictive placement" (Dkt. #16, at p. 11). Defendant claims this is supported by Jerome, who testified that Plaintiff needed assistance from "[s]omebody that is highly trained in executive functioning strategies and how to implement them with autism, within an autism diagnosis and also to be able to do it in a school setting…" (Dkt. #16, at p. 12). Jerome described the school environment that Plaintiff would need as being "[a] very specific, highly

individualized research-based intervention that has specific accommodations for his areas of disability" (Dkt. #16, at p. 12). She further elaborated that a regular junior high or high school environment would cause difficulty for Plaintiff *without accommodations* (Dkt. #16, at p. 12) (emphasis added). Jerome clarified that "her recommendations were intended to provide assistance in implementing interventions in the school" and "students similarly situated to [Plaintiff] were capable of being educated in the public school setting" (Dkt. #16, at p. 13). Accordingly, Defendant asserts that "Jerome stopped short and never testified that a non-public [Residential Treatment Center ("RTC")] was necessary or appropriate" (Dkt. #16, at p. 13). The only situation in which Jerome described an outside placement as being necessary was if Defendant was "unwilling or unable to provide" "30-40 hours of 'research-based instruction like ABA'" (Dkt. #16, at p. 14). Defendant also argues that its witness, Hart, "agreed with Dr. Jerome's earlier declaration that [Plaintiff's] needs did not necessarily require an outside placement" (Dkt. #16, at p. 15).

Finally, Defendant argues that its "capacity to discuss placement and LRE with Parents during the April 25, 2024 ARD committee meeting was severely limited due to the interference of Parent's Advocate, Debra Liva" (Dkt. #16, at p. 15).

#### *a) Plaintiff Could Not be Satisfactorily Educated in the General Education Classroom with Supplemental Aids and Services*

Generally, the Record demonstrates that Plaintiff could not "be satisfactorily educated in the regular classroom with supplemental aids and services." *See id.* at 466 (citing *Daniel R.R.*, 874 F.2d at 1048).

##### (1) Defendant's Steps to Accommodate Plaintiff

Defendant took steps to accommodate Plaintiff in regular education. *See id.* Those steps were numerous and outlined in Plaintiff's IEPs (AR 246-47, 304-05, 379-80). In the seventh grade, Plaintiff began the year with four general education courses—elective/PE, science, social studies,

and art (AR 253). His seventh grade science teacher stated that Plaintiff met "grade level expectations…show[ed] competencies in the areas of: participating in class, attempting assignments, turning in homework, working independently, requesting assistance, and following class rules…[and] [v]ery rarely…[had] outburst[s] and [got] upset when he [did not] get his way" (AR 291). In social studies, it was stated that Plaintiff "like[d] and [could] do well playing review games on computer and can work on or complete assignments digitally in effective manner" (AR 291).

**(2) Plaintiff Received an Educational Benefit from General Education Courses**

In the eighth grade, Plaintiff also took science and US history in general education classrooms (AR 365-66). Plaintiff's MAP data in science indicated that he started the year at the 73rd percentile and rose to the 77th percentile, falling within the average scores of his peers (AR 366). During the February 2024 STAAR assessment for United States history, Plaintiff scored twenty percent and did not meet grade level expectations (AR 366). However, of the previous four assessments, Plaintiff "was able to approach grade level expectations" in three assessments (AR 366). Plaintiff's United States history teacher stated that he did "not currently show a deficit in social studies that would require a specific academic goal" (AR 366). Further, Plaintiff was described as "remember[ing] information taught in class…able to recall and relate the material…[was] very knowledgeable and capable of participating and completing all in-class assignments…" (AR 366). Thus, it was proposed that in the ninth grade that Plaintiff should be placed in the general education setting for "Biology, World Geography, and electives classes…with support from special education personnel" (AR 395). Considering Plaintiff's

success in his general education science and history/social studies based courses, Plaintiff reaped some educational benefits from "regular education" in these courses.[12] *See id.*

**(3) Balance of the Benefits of Plaintiff's Educational Experience in General and Special Education**

Plaintiff's ARD committee weighed the benefits of Plaintiff's attendance in a mainstreamed environment versus those in a special education environment (AR 250, 308, 384) In the sixth, seventh, and eighth grades, the committee stated that "[Plaintiff] require[d] specialized instruction unavailable in the general education classroom [like] access to small group instruction to accomplish his individual education plan with specialized instruction, methodology, or content" (AR 250, 308, 384). In the seventh grade, the committee added that "[Plaintiff] [wa]s removed from general education for all core classes. He [wa]s able to participate in electives in the general education setting" (AR 308). Each year, it was specifically noted that Plaintiff's "behavior/needs are such that the student require[d] a structured/specialized environment for implementation of the IEP and BIP and/or that the student and/or other students would not benefit satisfactorily from instruction in the general education classroom" (AR 251, 309, 384). Based on the extensive documentation of Plaintiff's behavioral issues during the subjects for which he received special education, as outlined above, this assessment was reasonable.

**(4) Plaintiff's Effect on the General Education Environment**

Finally, Plaintiff's presence in the classroom had a significant impact on the education that his peers received. In the seventh grade, Plaintiff's teachers consistently noted his disruption in class—both in his general and special education courses.[13] Plaintiff's behavior in the eighth grade,

[12] There were some notations that Plaintiff struggled behaviorally in these courses (AR 366, 395).

[13] (AR 289) ("His behavior strongly interferes with his learning and the ability of his peers to learn"); (AR 289) ("He is extremely disruptive daily. Some of his behaviors include cursing out teachers/students, throwing items at

namely, striking another child, demonstrated an escalation of harmful behavior towards Plaintiff's peers.[14] Accordingly, Plaintiff's presence in the classroom environment affected the education of other students. Based on these factors, the court finds that Plaintiff could not "be satisfactorily educated in the regular classroom with supplemental aids and services." *See id.* (citing *Daniel R.R.*, 874 F.2d at 1048).

***b) Defendant Mainstreamed Plaintiff to the Maximum Extent Appropriate***

Thus, the question is "whether the [defendant] mainstreamed [the child] 'to the maximum extent appropriate.'" *Id.* (citing *Daniel R.R.*, 874 F.2d at 1048). In Texas, the continuum of educational environments range from mainstream (with or without special education arrangements), homebound, hospital, resource room/services, self-contained classroom (mild, moderate, or severe), off-campus home, nonpublic day school, vocational adjustment, residential care and treatment facility, and state-supported living center. 19 TEX. ADMIN. CODE § 89.1005(e)(1)-(11). Defendant had placed and proposed the continued placement of Plaintiff in mostly special education courses with some general education classes, the least restrictive environment in the continuum (AR 395). Plaintiff's filings and his request for placement at Behavior Network advocates for a *more* restrictive environment (Dkt. #17, at p. 21). Federal law requires a child to be educated in the least restrictive environment to the maximum extent possible. 20 U.S.C. § 1412(5)(a). Further, Plaintiff bears the burden of establishing by a preponderance of the evidence that the IEP was *not developed* to provide the *least* restrictive environment. *See L.B.*

teachers/students, crying, screaming, laying on the floor, twitching, etc…These behaviors significantly impact the learning of the other students in the class.") (AR 290) ("He is very disruptive and will cuss and scream around the other students")

[14] (AR 771) ("The school has concerns for [Plaintiff's] aggressive behaviors, especially as it pertains to his peers as he recently stuck another student in the face.").

*by & through Guillermo B. v. Katy Indep. Sch. Dist.*, No. 4:24-CV-118, 2025 WL 1084214, at *11 (S.D. Tex. Jan. 31, 2025), *report and recommendation adopted*, No. CV H-24-118, 2025 WL 1082793 (S.D. Tex. Apr. 9, 2025) (citing *H.W.*, 32 F.4th at 472) (emphasis added). Plaintiff failed to argue that and instead insisted that the IEP was not developed to provide a *more* restrictive environment (Dkt. #17, at p. 19). Thus, the SEHO correctly found that Plaintiff "failed to prove, by a preponderance of the evidence, that [Defendant's] attempts to educate [Plaintiff] in a less restrictive environment [we]re inappropriate" (AR 23).

### 3. Factor Three: Provision of Services in a Coordinated & Collaborative Manner

Third, the court asks whether the services outlined in the IEP were "provided in a coordinated and collaborative manner by the key 'stakeholders.'" *Hovem*, 690 F.3d at 396 (quoting *Michael F.*, 118 F.3d at 253). "This factor requires a variety of individuals, including persons with personal relationships to the student and school district employees, to work together to jointly develop the student's IEP." *T.L.*, 2020 WL 4434928, at *8 (citing *Michael F.*, 118 F.3d at 253). "Furthermore, simply because disagreement exists between the guardian and the School District as to the proper services to provide does not mean that the factor is not met." *Id.* (citing *R.C. ex rel. S.K., D.H. v. Keller Indep. Sch. Dist.*, 958 F. Supp. 2d 718, 736–37 (N.D. Tex. 2013)); *see also William V. v. Copperas Cove Indep. Sch. Dist.*, No. 6:17–CV–00201–ADA–JCM, 2019 WL 5394020, at *9 (W.D. Tex. Oct. 22, 2019). "Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the parents' input, a school district has met IDEA requirements with respect to parental input." *T.L.*, 2020 WL 4434928, at *8 (quoting *White*, 343 F.3d at 380) (alterations omitted).

The SEHO found that Plaintiff did not prove "that [Defendant] failed to act in a coordinated, collaborative manner in working with Parents to develop the IEP. To the extent the

process was uncollaborative, it was attributable to Parents" (AR 25). Specifically, the SEHO found that

> [t]hroughout the relevant period the record shows substantial communication with, and responsiveness to, Parents by [Defendant] regarding Parents' concerns for [Plaintiff's] education. However, the most recent ARD Committee meeting was not collaborative, with Ms. Liva, [Plaintiff's] advocate, and Parents leaving before the end of the meeting. A review of the records of that meeting show that Ms. Liva and Parents, not the [Defendant's] members of the ARD Committee, were the parties acting in a non-collaborative manner. Ms. Liva demanded that the ARD Committee skip the development of goals and accommodations and move immediately to placement. When the [Defendant's] members of the ARD Committee refused, stating that goals and accommodations informed placement, Ms. Liva and Parents refused to participate further and left the meeting…Additionally, nothing in the record shows that [Defendant] was intentionally prolonging the meeting, engaging in unnecessary discussion, or antagonizing [Parents].

(AR 24-25).

Plaintiff argues that Defendant "didn't want to make an outside placement, so [it] prevented [his] parent[s] from being able to discuss it at [the] ARD. This behavior was not collaborative" (Dkt. #17, at p. 23). To begin, Plaintiff states that his parents "requested an ARD meeting to discuss placing [him] at Behavior Network so he could receive ABA therapy" (Dkt. #17, at pp. 21-22). Plaintiff claims that Defendant's employees were aware of his parents' desire to "discuss a placement change" from the outset (Dkt. #17, at p. 22). Despite this, Plaintiff asserts that Defendant's employees intentionally did not invite a representative from Behavior Network to the ARD meeting, though they had previously done so with other students (Dkt. #17, at p. 23).

During this meeting, Plaintiff explains that his parents consented to Defendant's proposal to run further tests on him so that Defendant could make a placement decision (Dkt. #17, at p. 22). When his parents and Defendant's employees met for the second ARD after the testing, Plaintiff claims that his parents "were not treated as equal partners of those ARD committees…[and] after four hours of ARD meetings, [Defendant's employees] still w[ere] not willing to discuss the issue

of outside placement…" (Dkt. #17, at p. 22). During that time, Plaintiff argues that Defendant's employees insisted on "finish[ing] all the other elements of the IEP before it could consider placement…[which Defendant's] witness admitted…was no[t] [a] legal requirement regarding the order of an ARD meeting" (Dkt. #17, at p. 23). Plaintiff argues that this behavior was Defendant "essentially filibuster[ing] these meetings so that the parents never got to discuss placement, the entire reason those meetings were called" (Dkt. #17, at p. 23). Thus, Plaintiff accuses Defendant of being uncollaborative during the creation of Plaintiff's IEP for his upcoming ninth grade year (Dkt. #17, at pp. 21-23).

Defendant argues that Plaintiff "failed to prove that [it] failed to act in a coordinated, collaborative manner and that, to the extent the process was uncollaborative, it was attributable to Plaintiff['s] [parents]" (Dkt. #16, at p. 18). To support this, Defendant asserts that Plaintiff "presented no evidence that the IEPs which were developed and put in place prior to the 2024 ARDC meetings were anything but the result of a collaborative process…" (Dkt. #16, at p. 18). The court agrees that Plaintiff did not challenge the collaborative process prior to the 2024 ARD meetings.

In terms of the 2024 ARD meetings, Defendant asserts that "the record reflects that it was []Liva and Plaintiff['s] [parents] who were acting in a non-collaborative manner as demonstrated by []Liva demanding at the February 28, 2024, ARDC meeting, that the ARDC skip the process of developing goals and accommodations and move immediately to the topic of outside placement" (Dkt. #16, at p. 18). Defendant further argues that no predetermination took place to prevent Plaintiff's placement at Behavior Network and that Plaintiff presents no evidence of that (Dkt. #16, at pp. 20-21).

There is no evidence in the Record that Defendant engaged in a filibuster during Plaintiff's 2024 ARD meetings (AR 391-96). The initial February 28, 2024, ARD meeting included Defendant's employees, Liva, and Plaintiff's parents (AR 390). Therein, Plaintiff's parents "noted the following concerns: physical aggression, hygiene issues, and court proceedings due to violent behavior" (AR 390). When Liva brought up Plaintiff's potential placement at Behavior Network, the committee reviewed Plaintiff's schedule, support, access to general education, and his behavior's impact on his learning and the learning of his peers (AR 390-91). Afterwards, Defendant "proposed additional assessment to collect data to determine if changes are needed to the IEP based upon parent concerns" (AR 391). The meeting on February 28, 2024, ended with the parties in agreement that Plaintiff would undergo an early FIE (AR 391).

The follow-up meeting occurred on April 25, 2024, and began at 12:30 p.m. with Defendant's employees, Plaintiff's parents, and advocate present (AR 393). The committee had blocked off four hours for the meeting (AR 393). The committee began by discussing the results of Plaintiff's FIE (AR 393). The FIE had many components and related to various crucial aspects of Plaintiff's academic, behavioral, speech, and health progress (AR 391). This necessitated discussions with different professionals (AR 391-92). This portion of the meeting ended at 3:15 p.m. (AR 393). At that point, Defendant's employees wished to discuss the "development of goals, accommodations, and other components of the IEP" prior to outside placement (AR 392). Liva insisted that outside placement be discussed and reiterated this sentiment after a break was taken (AR 392-93). When Defendant's employees refused to do that, Liva and Plaintiff's parents left the meeting (AR 393).

The Record demonstrates that Plaintiff's parents were not excluded from the creation of Plaintiff's IEP for his upcoming ninth-grade year (AR 391-96). Plaintiff's parents were invited

and attended both ARD meetings in 2024, along with their advocate (AR 390-96). The ARD committee listened to the parents and their concerns, to the point that it ordered an early FIE to assess Plaintiff's needs (AR 390). Plaintiff's parents and advocate left Plaintiff's April 25, 2024, ARD meeting instead of staying and participating in the IEP process (AR 393). Thus, if anything, the Record indicates that Plaintiff's parents and their advocate were unwilling to collaborate with Defendant's employees (AR 390-96). Parents have the right to provide meaningful input in the IEP development process, but this does not equate to a "a veto power…" *White*, 343 F.3d at 380. Thus, the court agrees with the SEHO's determination that Plaintiff did not establish that "[Defendant] failed to act in a coordinated, collaborative manner in working with Parents to develop the IEP" (AR 25).

**4. Factor Four: Demonstrable Positive Academic and Non-Academic Benefits**

The fourth *Michael F.* factor, whether "positive academic and non-academic benefits are demonstrated," is the most critical factor in this analysis. *Hovem*, 690 F.3d at 396, 399 (quoting *Michael F.*, 118 F.3d at 253). "[E]vidence of an academic benefit militates in favor of finding an IEP is appropriate." *Id.* (citing *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 810 (5th Cir. 2003)). "Courts determine whether academic and non-academic benefits resulted from a student's IEP by looking to the individual student's progress or regress, rather than by comparison to the academic progress achieved by the student's peers." *T.L.*, 2020 WL 4434928, at *8 (citing *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)).

"[W]hen a learning-disabled student is being educated in the regular classrooms of the public education systems, an IEP should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Hovem*, 690 F.3d at 396 (citing *Rowley*, 458 U.S. at 204) (internal quotation marks and alterations omitted). "However, the core of the IDEA

is to provide access to educational opportunities and requires only the 'basic floor of opportunity,' and some meaningful educational benefits more than de minimis, not a perfect education and not the maximum of [the child's] potential." *E.M.*, 2018 WL 1510668, at *16 (citing *V.P. ex rel. Juan P.*, 582 F.3d at 583). Thus, this factor requires the court to examine the "unique circumstances of the child for whom [the IEP] was created." *Renee J.*, 333 F. Supp. 3d at 691 (quoting *Endrew F.*, 580 U.S. at 404).

***a) Academic Benefits***

With respect to this element of the fourth factor, Plaintiff's academic progress, the SEHO determined that "while [Plaintiff's] performance on testing [wa]s problematic, [Plaintiff's] high growth, as demonstrated by his MAP scores, his passing grades, and the testimony of [Plaintiff's] expert, show[ed] that [Plaintiff] is receiving meaningful academic benefit" (AR 226). The SEHO reasoned that "[Plaintiff's] MAP scores show[ed] that, while he [was] staying the same or declining in performance relative to his peers, he [wa]s experiencing 90+ percentile personal growth in his areas of low performance," he passed all his courses from sixth to eighth grade,[15] and Plaintiff's own expert testified that "based upon her review of the records and MAP scores, many of the education programs like reading and written language accommodations [were] research-based and [were] [] successful" (AR 226).

Plaintiff argues that he experienced "significant personal regression" in his academics (Dkt. #17, at p. 4). To begin, Plaintiff points out that he began sixth grade with a reading level "which correlated with a beginning of the 6th grade reading level" (Dkt. #16, at p. 4). By the end of eighth grade, he tested at "a 2nd to 3rd grade reading level" (Dkt. #16, at p. 4). Plaintiff also

[15] The SEHO recognized that Plaintiff had an accommodation to "not receive a grade below 70 after a re-take or review" in the eighth grade but did not in the sixth or seventh grade (AR 226). Further, the SEHO determined that "no evidence was offered to show what, if any, effect consideration of Student's effort and participation or the minimum grade accommodation had on [Plaintiff's] grades" (AR 226).

points to his RIT score dropping from 211 at the beginning of sixth grade to 203 in eighth grade; his MAP score in reading slipping from the 54th percentile in sixth grade to the 15th percentile in eighth grade; his failure to meet grade level expectations in reading on his sixth, seventh, and eighth grade STAAR tests; his MAP score in math slipping from the 39th percentile in the sixth grade to the 27th percentile in eighth grade; his ability to approach grade level expectations in the math STAAR testing during the sixth grade, but not meeting grade level expectations in the eighth grade; and an IEP accommodation in eighth grade that made it impossible for him to fail his courses because his teachers were required to "'consider effort/participation as part of [his] grade' and [he could not] receive [a] test grade below a 70 in the gradebook for a District Assessment after re-take and/or review" (Dkt. #17, at pp. 4-6). Further, Plaintiff argues that this data is especially concerning because Defendant's "evaluation placed him at an IQ level of 88, which is within the average range" and demonstrates he is capable of learning and making academic progress (Dkt. #16, at p. 6).

Defendant argues that "except for one grading period in Writing, [Plaintiff] was able to pass his classes and advance from grade to grade…[f]urther, his Map Scores showed that he generally made progress throughout the school year" (Dkt. #16, at p. 8). Thus, Defendant concludes that "the record affirmatively demonstrates that the IEP resulted in [Plaintiff] receiving real academic benefits" (Dkt. #16, at p. 8).

When assessing a disabled child's academic benefit, the court is called to determine if "the educational program…[is] 'appropriately ambitious in light of [his] circumstances.'" *H.W.*, 32 F.4th at 467. This requires "an *overall* academic record-based review." *Id.* at 468 (emphasis added). This assessment includes reviewing a child's "grade-level advancement and tests scores," but they are not "*per se* indicators" of academic benefit. *Id.* at 467. Moreover, a disabled child's

academic achievement should not be measured in comparison to his non-disabled peers. *Id.* Thus, a disabled child's progression in his IEP goals, test scores, and percentile rank are reviewed as such and no factor is dispositive. *Id.* at 469.

The preponderance of the evidence does not support the SEHO's finding that Plaintiff received meaningful academic benefits from Defendant. To begin, Defendant failed to appropriately monitor Plaintiff's IEP progress and/or regression (AR 332-43, 640-71). Though Defendant kept progress reports of Plaintiff's IEP goals, none of them appropriately tracked Plaintiff's work throughout the entire academic year or for the allotted timeframe (AR 332-43, 640-71).

Defendant claims that Plaintiff's MAP scores "showed that he generally made progress *throughout the school year*," but the court is called to assess Plaintiff's *overall* academic record (Dkt. #16, at p. 8) (emphasis added). *See id.* 468. As such, a review of Plaintiff's MAP testing demonstrates that he never showed consistent, reliable, or significant progress (AR 234-35, 288, 291-92, 364, 571, 573). Regarding reading, Plaintiff began the sixth grade in the 54th percentile, midway through the year he fell to the 18th percentile, and he finished the year in the 19th percentile (AR 234). In the seventh grade, Plaintiff's reading MAP score began at the 37th percentile and fell to the 26th percentile (AR 288, 291). Finally, during his eighth grade year, Plaintiff's reading MAP scores started in the 1st percentile and finished in the 15th percentile (AR 573). Despite three years of education, Plaintiff never tested as high in reading as he did at the beginning of sixth grade (AR 234, 288, 291, 573).

In his math MAP scores, Plaintiff began the sixth grade testing in the 12th percentile, rose to the 37th percentile, and finished the year in the 39th percentile (AR 235). In the seventh grade, Plaintiff started in the 13th percentile and rose to the 32nd percentile (AR 292). Finally, in the eighth

grade, Plaintiff first tested in the 1st percentile and finished the year in the 27th percentile (AR 571). As such, in math, Plaintiff was performing worse at the end of his eighth grade year than he was at the end of his sixth grade year (AR 235, 571). Regardless of the "growth" that the SEHO cited throughout Plaintiff's yearly testing, Plaintiff's overall testing record clearly demonstrates Plaintiff's academic regression.

Plaintiff's STAAR testing also showed regression (AR 820-30). Regarding math, Plaintiff received a 39 percent in the sixth grade and approached grade level (AR 820). In the seventh grade, Plaintiff fell to 30 percent and did not meet grade level expectations (AR 824). Finally, in the eighth grade, Plaintiff tested at a 33 percent and did not meet grade level expectations (AR 828). Thus, over the course of three years, Plaintiff regressed in his math STAAR scores. In terms of reading, Plaintiff also regressed in his STAAR scores. Plaintiff tested at 28 percent in the sixth grade and did not meet grade level expectations (AR 822). In the seventh grade, Plaintiff tested at 25 percent and did not meet grade level expectations (AR 826). Finally, in the eighth grade, Plaintiff tested at 20 percent and did not meet grade level expectations (AR 830).

Additionally, Plaintiff started sixth grade with a reading level that approximated "the end of 5th grade/beginning of 6th grade" (AR 6, 234). By the time Plaintiff finished eighth grade, Plaintiff's reading level was at that of a second or third grader (AR 12). Again, this clearly demonstrates academic regression.

This is all compounded by the fact that Plaintiff's Full-Scale IQ "falls in the low average range of ability" and his General Ability Index is "well within the average range" (AR 518). This suggests that Plaintiff has the capability to achieve more than he had (AR 518, 977, 1067). Taken together, the court concludes that the preponderance of the evidence does not support the SEHO's finding that Plaintiff received meaningful academic benefits from Defendant.

***b) Non-academic Benefits***

With respect to the second part of the fourth factor, Plaintiff's non-academic progress, the SEHO initially determined that "the record does not support a finding that [Defendant] was not managing [Plaintiff's] behavior (AR 224). Specifically, the SEHO found that "seven instances of misconduct were recorded"[16] during Plaintiff's eighth grade year (AR 224). The SEHO classified this as infrequent and did not find them to be concerning types of incidents (AR 224). The SEHO noted that Plaintiff's father testified that there were further incidents that were unrecorded, but no proof of them was offered (AR 225).

The SEHO further found that Plaintiff's progress "in using pre-taught strategies to not become verbally or physically aggressive" showed regression,[17] Plaintiff "continue[d] to struggle with identifying triggering situations" and "the data reflect[ed] that [Plaintiff] continue[d] to struggle to generalize the behavioral skills [Defendant]" taught him (AR 225). However, the SEHO also concluded that the "records from the ARD Committee meetings reflect[ed] that [Plaintiff] [was] very good at identifying appropriate behavior strategies in class but has difficulty applying those strategies in the moment," "[Plaintiff] [] show[ed] progress in independently taking notes," and "the record does not support [Plaintiff's] assertion that [Defendant] [wa]s unable to manage [Plaintiff's] behaviors or that [Defendant] [] failed to provide [Plaintiff] with meaningful benefit related to his behavior" (AR 224).

Further, the SEHO determined that "[Plaintiff] failed to prove, by a preponderance of the evidence, that [Defendant] failed to appropriately address [Plaintiff's] toileting concerns" (AR

[16] "One of those incidents involved striking another student, two involved throwing a small object at a staff member, one involved picking up a chair in a manner that a staff member believed was threatening, and the rest involved [Plaintiff] failing to obey directives from staff" (AR 224).

[17] This IEP goal was discussed in detail above.

226). The SEHO reasoned that Plaintiff's toileting problems were medical in nature and were being accommodated by Defendant through "reminders to use the restroom, a hygiene contract, and access to the nurse's bathroom to [allow Plaintiff to] attempt to use the restroom and to clean himself" (AR 225). Moreover, the SEHO pointed out that there was no argument by Plaintiff "regarding what, if anything, more could be done" to address these hygiene concerns (AR 226).

Plaintiff argues that he did not receive a non-academic benefit based on "his behavioral regression and functional regression" (Dkt. #17, at p. 7). Specifically, Plaintiff states that during his time in Defendant's school system, his "behavioral problems [] escalated from class disruption and spontaneous misbehavior, to an uncontrollable state, where [Plaintiff] [wa]s breaking school equipment, including Chromebooks or laptops, attempting to kick doors down, attacking paras and teachers and other students" (Dkt. #17, at p. 7), Further, Plaintiff cites his teachers' comments on his behavior throughout his sixth, seventh, and eighth grade years as support for this assertion (Dkt. #17, at pp. 7-8). Additionally, Plaintiff points to a "distinct lack of evidence that [he] made any progress on his IEP behavior goals" (Dkt. #17, at p. 9). Regarding the IEP progress reports, Plaintiff also notes that they are "disjointed and hard to read," though they generally demonstrate that Plaintiff had behavioral regression (Dkt. #17, at p. 9). Plaintiff then clarifies that Defendant's expert's testimony (Hart) regarding his behavioral progress was confined to seventeen days of observation during his 2024 FIE assessment (Dkt. #17, at p. 10). Plaintiff claims that the court cannot ignore the other data that demonstrated his behavioral issues escalated over the years (Dkt. #17, at p. 10).

Regarding his functional regression, Plaintiff points to his issues with toileting (Dkt. #17, at p. 11). In particular, Plaintiff argues that in sixth grade he simply needed reminders to use the restroom and had several accidents (Dkt. #17, at p. 11). However, by the eighth grade, this behavior

had escalated to the point that Plaintiff would not use the restroom on his own, had to have a hygiene contract, and became "aggressive and physically aggressive towards school staff" when he had an accident and would not clean himself (Dkt. #17, at p. 11). Further, this issue is compounded by the fact that his father testified that Plaintiff entered kindergarten potty trained (Dkt. #17, at p. 11). Plaintiff asserts that this issue is more than medical and relates to his behavioral concerns because of his reactions to engaging in proper hygiene (Dkt. #17, at p. 11).

Defendant asserts that Plaintiff "failed to carry the burden of proving that the IEPs and BIPs developed and implemented by [it] failed to provide an academic and non-academic benefit" (Dkt. #16, at p. 9). Regarding non-academic benefit, Defendant states that "the evidence presented does not support" the allegations that Plaintiff had an increase in bad behaviors that potentially "result[ed] in involvement with the juvenile justice system along with a perception that [Plaintiff] was missing significant amount of instructional time" (Dkt. #16, at p. 9). Rather, Defendant argued that "[d]isciplinary incidents during the relevant period [we]re relatively infrequent, minor, and reflect[ed] progress on behavioral goals… Further, the evidence clearly show[ed] that the time out of [instructional] placement to address hygiene issues was not reflective of non-academic failures, but a medical necessity" (Dkt. #16, at p. 9).

The preponderance of the evidence does not support the SEHO's finding that Plaintiff received meaningful, non-academic benefits from Defendant. As explained above, Defendant failed to appropriately monitor Plaintiff's IEP progress and/or regression (AR 332-43, 640-71). The most data collected by Defendant was on the following IEP goal:

> [d]uring a moment of frustration, given a list of pre-taught calming strategies, [Plaintiff] will select a strategy to use with no more than 1 prompt within 15 seconds and not become verbally or physically aggressive in at least 50% [or 70%] of opportunities

(AR 265). In the sixth grade, Plaintiff maintained a 31 percent accuracy rate (AR 265). In the seventh grade, Plaintiff started at 70 percent and fell to 60 percent (AR 332-33). The goal was raised to 70 percent when Plaintiff entered the eighth grade (AR 669). At the beginning of eighth grade, without assistance, Plaintiff achieved a 70 percent success rate (AR 669). However, Plaintiff's progress fell over the measured period and by the end of the eighth grade he was only able to meet the goal approximately 50 percent of the time (AR 669).[18] This data demonstrates regression. At the very least, it shows a lack of any meaningful or consistent progress.

Other portions of the record demonstrate that Plaintiff's behavioral issues escalated from sixth to eighth grade. In the sixth grade, Plaintiff "[had] verbal outburst[s,] cussing at staff and peers or flipping them off" and was "physically aggressive towards staff and or peers on many occasions. [Plaintiff's] physical aggression include[d] hitting, kicking, biting, throwing things such as his chromebook and threatening to stab people with pencils or pens" (AR 236). In the seventh grade, Plaintiff continued to have "outburst[s] in class and [] cussed at teachers/paras…[Plaintiff] [] used physical aggression towards paras including hitting (2 times/year), kicking (1 time/year), and throwing items (1 time/year)" (AR 290). However, in the eighth grade, Plaintiff's behavior became so aggressive that he "struck another student on the arm" and had a juvenile criminal action filed against him (AR 817). Accordingly, his behavior did not improve and actually escalated to violence that resulted in criminal consequences.

In terms of toileting, Plaintiff's capability in this area regressed. Plaintiff's father testified that Plaintiff was potty trained in kindergarten (AR 946). However, in the sixth grade, Plaintiff "need[ed] reminders to complete his hygiene at school. There [were] several incidents of him having accidents" (AR 236). By the seventh grade, Plaintiff still "need[ed] to be

[18] The ARD Committee cited a progress report that showed Plaintiff finished the eighth-grade year at 80 percent in this IEP goal (AR 669). However, this report was not included in the record before the court.

prompted/reminded to use the restroom during each passing period as well as when he [got] to school in the morning" (AR 321). Failure to provide such assistance would result in "poor personal hygiene related to encopresis" (AR 322). However, by the eighth grade Plaintiff continued to "struggle[] with maintaining a healthy level of hygiene…[he] [did] not use the bathroom in the toilet on his own and [wa]s [in] need of a hygiene contract and routine to use the bathroom at school" (AR 365). Plaintiff's functional behavior regarding restroom use and hygiene regressed in this time period.

As such, the preponderance of the evidence does not support the SEHO's finding that Plaintiff received meaningful, non-academic benefits from Defendant.

As detailed above, the "positive academic and non-academic benefits" factor is the most critical. *Hovem*, 690 F.3d at 396, 399 (quoting *Michael F.*, 118 F.3d at 253). The first three *Michael F.* factors weigh in favor of Defendant, but the last, and most critical, weighs in favor of Plaintiff. As such, the court finds that Defendant did not substantively comply with IDEA.

***B. Plaintiff failed to Establish that Behavior Network is a Proper Placement***

In his Complaint, Plaintiff specifically states that he seeks "all relief requested of the Special Education Officer" (Dkt. #1, at p. 4). In his Complaint to the SEHO, Plaintiff asked the SEHO to "Order [] [Defendant] to provide private placement at Behavior Network in McKinney" (AR 37). In his present Motion, Plaintiff asks the court to find "that placement at Behavior Network at District expense was appropriate" (Dkt. #17, at p. 25). Accordingly, Plaintiff is seeking from Defendant reimbursement for, and the future costs of attendance at, Behavior Network. [19] The

[19] The court need not address whether Plaintiff may bring a claim for reimbursement for private placement at Behavior Network. This case was styled in a way that Plaintiff's parents brought the suit as next of friends, not individually (Dkt. #1, at pp. 1-2). As explained above, this means that Plaintiff's parents "[are] neither technically nor substantially the party…" *Morgan*, 157 U.S. at 198. However, a claim for reimbursement would belong to the party that incurred the cost—Plaintiff's parents, not Plaintiff. 20 U.S.C. § 1412(10)(C)(ii) ("reimburse the parents for the cost of that enrollment"). Neither party addressed this issue.

appropriate test to determine if a plaintiff is eligible for the cost of private placement in an institution, after determining that a child did not receive a FAPE, consists of two parts: the placement is "1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education." *Michael Z*, 580 F.3d at 299.

The SEHO found that Plaintiff did not meet the necessary elements to qualify for private placement at Behavior Network at Defendant's expense (AR 229). As an initial matter, the SEHO found that Defendant provided Plaintiff "with a FAPE…" (AR 229). As such, the SEHO concluded that "private placement at public expense [wa]s not appropriate" (AR 229). Further, the SEHO stated that even if Defendant did not provide a FAPE, Plaintiff still failed to establish that private placement was appropriate (AR 229). This was because

> [n]o witnesses from Behavior Network were called. No documents reflecting the educational programs available at Behavior Network were offered into evidence. A review of the testimony show[ed] only a hearsay statement from [Plaintiff's] father that the director of Behavior Network felt that placement was warranted, that someone from Behavior Network had contacted [Defendant] regarding [Plaintiff], and that some other students at [Defendant's district] have been placed with Behavior Network. While it was implied that Behavior Network would provide the intensive ABA services recommended by [Plaintiff's] experts, without some direct testimony or evidence regarding the specifics of the courses or programs that would be offered to [Plaintiff] and how those courses or programs would meet [Plaintiff's] needs, the [SEHO] [could not] determine if such a placement [wa]s appropriate.

(AR 229-30).

In the present lawsuit, Plaintiff filed additional evidence under seal (Dkt. #13-1). The evidence consists of treatment records and notes from Behavior Network and its providers (Dkt. #13-1). Plaintiff asserts that the SEHO never reached the issue of private placement at Behavior Network (Dkt. #17, at p. 23).[20] As such, Plaintiff asks the court to find that Defendant must pay

---

[20] However, the SEHO specifically stated that "[Plaintiff] did not meet his burden to prove that the proposed private placement was appropriate. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. Of Mass.*, 471 U.S. 359 (1985);

for the cost of sending Plaintiff to Behavior Network (Dkt. #17, at pp. 23-25). Plaintiff argues that Dorvilus testified that "ABA is the most recommended practice for individuals…with Autism" and "address[ing] [Plaintiff's] behaviors through ABA [] will help him academically" (Dkt. #17, at p. 24). Plaintiff further points to Jerome's recommendation that "ABA therapy is an educational necessity… that [Plaintiff] needs to overcome his current challenges with extremely low levels regarding adaptive behaviors/activities of daily living…to function in a school environment…to make progress on academics…and to address his needs relating to behavioral regulation" (Dkt. #17, at p. 24). Further, Plaintiff directs the court to his new exhibits in which Behavior Network "recommends continued ABA therapy because '[Plaintiff] is currently unsuccessful in a less restrictive setting due to problem behavior engagement, lack of social emotion reciprocity/ interpersonal skills, and low motivation and cooperation with adult directed instruction. Ameliorating these deficits and behavioral excesses will provide [Plaintiff] [with] a much better skill set to cope with the demands of the educational and home setting'" (Dkt. #17, at pp. 24-25). Finally, Plaintiff concludes that Defendant is "unwilling and unable to provide such a placement" (Dkt. #17, at p. 25). Thus, Plaintiff asks the court to "find that placement at Behavior Network at District expense was appropriate or remand to the administrative level for consideration of this issue" (Dkt. #17, at p. 25).

Defendant argues that Plaintiff's additional evidence demonstrates that Behavior Network "anticipates [Plaintiff] returning to a public education environment and coordination with school officials for any supplemental treatment that may be necessary" (Dkt. #16, at p. 20). As such, Defendant asserts that Plaintiff is not entitled to compensation for his enrollment in Behavior Network (Dkt. #16, a tp. 20).

---

*Florence Cnty. v. Carter*, 510 U.S. 7 (1993); *Teague Indep. Sch. Dist. v. Todd L*, 999 F.2d 127 (5th Cir. 1993)" (AR 31).

The test set forth in *Michael Z* is primarily concerned with the educational benefits that a child obtains and the private institution's orientation towards education. *See* 580 F.3d at 299. The Record does not demonstrate that Plaintiff receives any educational benefit from Behavior Network. The behavioral improvement and tools obtained at Behavior Network are geared towards assisting Plaintiff, in part, "with the demands of the educational…setting" (Dkt. #13-1, at p. 5). However, a private placement is not essential "if a child is able to receive an educational benefit without" it. *Id.* at 300. Plaintiff is not attending school at Behavior Network and is instead being homeschooled (Dkt. #13-1, at p. 2) (AR 4). Thus, Plaintiff is receiving his educational benefits in a wholly separate program outside of Behavior Network (AR 4). As such, the court cannot find that Plaintiff's attendance at Behavior Network is "essential in order for [him] to receive a meaningful educational benefit." *Id*. at 299.

Further, the court cannot find that Behavior Network's services, as applied to Plaintiff, are "primarily oriented toward enabling [Plaintiff] to obtain an education." *Id.* To determine if a private placement is primarily oriented towards enabling a child to obtain an education, several factors are examined. *Id.* at 301. "Such factors include, but are not limited to: whether the child was placed at the facility for educational reasons and whether the child's progress at the facility is primarily judged by educational achievement." *Id.* Here, although Behavior Network has "an accredited private school program" and a TEA "approved non-public school program," Plaintiff is not attending either (AR 4).[21] Instead, Plaintiff is being homeschooled and only receiving "ABA Therapy at Behavior Network" (Dkt. #17, at p. 2). Plaintiff was placed at Behavior Network because he "struggles with emotional regulation, rule following and engaging in a hygiene routine," which in turn affects his education (Dkt. #13-1, at p. 2). These are not primarily

---

[21] *Services We Offer*, BEHAV. NETWORK, https://www.behaviornetwork.net/services#ID-Private-School (last visited May 20, 2026).

educational reasons. Further, Plaintiff's progress at Behavior Network is not judged by educational achievement (Dkt. #13-1, at pp. 8-66). Accordingly, Behavior Network is not "primarily oriented toward enabling [Plaintiff] to obtain an education." *See id.*

Thus, the private placement at Behavior Network was not appropriate under IDEA. *See V.P. ex rel. Juan P.*, 582 F.3d at 584. As such, Plaintiff failed to qualify for reimbursement for his placement at Behavior Network. *See id.*

## V. CONCLUSION

Based on the foregoing, Defendant Wylie Independent School District's Motion for Summary Judgment (Dkt. #16) is **GRANTED** with respect to Plaintiff failing to meet his burden to establish that the proposed placement at Behavior Network was appropriate and **DENIED** with respect to Defendant's failure to provide Plaintiff with a FAPE. The court further recommends that Plaintiff W.L., by next friends D.L. and A.L.'s, Motion for Judgment on the Administrative Record (Dkt. #17) is **GRANTED in part and DENIED in part** as to the same issues. The court finds that Plaintiff is the prevailing party and may recover attorney's fees pursuant to 20 USC § 1415(i)(3). Plaintiff may file a motion for attorney's fees within thirty (30) days of the entry of this Memorandum Opinion and Order. The court hereby **ORDERS** that this case is **REMANDED** to the administrative level for consideration of additional remedies.

**IT IS SO ORDERED.**

**SIGNED this 24th day of September, 2026.**

Aileen Goldman Durrett

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE